ENNIS v. WATERMAN S. S. CORPORATION.

District Court, S. D. New York.
April 21, 1943.

Benjamin B. Sterling, of New York City, for plaintiff.

Silliman, Gay & Behrens, of New York City (Edward J. Behrens, of New York City, of counsel), for defendant.

BYERS, District Judge.

Decision was reserved on a motion for a directed verdict made by the defendant at the conclusion of the taking of testimony on March 31, 1943. The cause was submitted to the jury on April 1, 1943, and disagreement resulted after four and a half hours of deliberation. Then the testimony of the plaintiff was ordered, to assist the court in deciding the said motion.

It was my impression at the time, which has been fortified by reading the minutes, that the plaintiff's testimony, so far as essential to his alleged cause of action, was incredible; and since he was the only plaintiff's witness, and in all important respects was flatly and convincingly contradicted by the defendant's witnesses, the master of the ship and the chief engineer, the only rational thing to do is to grant the defendant's motion.

The plaintiff seeks to recover his wages as a seaman for a voyage on defendant's steamship Gateway City, leaving New York on or about April 23, 1942, for a round trip to foreign ports. He left the ship when she was anchored in the Clyde, Scotland, on or about August 9, 1942, having obtained a four-days leave from the first assistant engineer; when he left, he had no intention of returning, and thus deserted the ship, and is not entitled to the wages which he seeks in this cause, unless he was justified under the law in thus breaching his contract of employment.

On obtaining the said leave, he requested $250 on account of his wages, and received £ 60, which is agreed to have been worth something over $240, which was acceptable to him as to amount. He did not go to the American Consul in Glasgow to complain against the officers because of cruel treatment, as provided in Title 46 U.S.C.A. § 685, but waited until he was sure that the ship had left port, so that the master and other officers would not be available, and then visited the Consul and made an indefinite kind of representation, which resulted in his being returned to this country at the expense of the defendant, and he arrived on September 18, 1942, and began this action on the 30th of that month.

He signed on the Gateway City under regular shipping articles as a watertender at $110 a month plus a bonus of 100% together with port bonuses, overtime and subsistence, and his present suit is for the wages earned, as he said, up to the time that he left the ship plus wages to the end of the voyage; and as to the first, if he is entitled to recover, the amount is $1,034.10, and as to the second the amount is $1,452.50, or $2,486.60 in all. The third cause pleaded in the amended complaint, for unreasonably withholding wages, was withdrawn at the opening of the trial.

The vessel had not completed her homeward voyage at the time that the plaintiff arrived in New York last September, and therefore her officers and records were not available when the plaintiff did make a demand for his wages before bringing suit; but in view of the nature of the plaintiff's assertions it of course is not a surprise that the defendant's representatives were not in a position to deal with him until the true facts could be shown as they developed at the trial.

The plaintiff's testimony discloses that on a certain day in May, 1942, after the ship, which crossed the Atlantic eastbound in convoy, had left Halifax, he was sent for and told to report in the captain's cabin. As to that, there is no question, and so much of his testimony is true. He had just come off his watch at 4 a.m., and there is a dispute as to whether he was told to report by the chief engineer or by some one else acting under the master's instructions. The point is probably unimportant but the plaintiff's version is unlikely, but not sufficiently so to condemn the rest of his narrative; that is, as to who it was who gave him the message.

He testified that at this time the chief engineer was obviously intoxicated, and that on accompanying him to the captain's cabin he found the latter in a similar condition, and also the captain of the gun crew (Gateway City was an armed merchantman), and that as soon as he entered the captain's cabin he observed many liquor bottles, and that the master, the chief engineer and the captain of the gun crew were

all armed; that the captain drew his pistol, pointed it at the plaintiff, jammed it in his ribs, and addressed an epithet to him which is in frequent use along the waterfront and in the less formal places where men gather, and in "smart" modern literature.

He said that on that occasion he was repeatedly addressed in coarse language and told that his life would not be worth a nickel thereafter because he was a low character specifically and in general; that the interview lasted about three hours; further, that he was not able to find out what it was all about at the time, and since the other persons present were so intoxicated and belligerent, he permitted himself to be shoved around because he was afraid that otherwise he would be shot.

That testimony was contradicted in part by what he said at the examination before trial, which was that on the said occasion he was informed that he had been trying to create a panic among the young men of the gun crew by exaggerating the dangers that confronted the ship and all who were on board, and that his conduct was generally demoralizing to the ship's company. In other words, his testimony at the trial was contradictory to his statement given at his examination, in that important respect.

On the witness stand he stated that there were many liquor bottles in evidence on the table in the captain's cabin, half full, but after evading the question twice, he finally answered the court that he did not see any one take a drink while he was there. He said that he knew that the others were intoxicated because the smell of liquor nearly knocked him down and they did not talk naturally, and that he smelled liquor very plainly.

As to the duration of this interview, no reason is seen why it should have occupied two and a half or three hours as the plaintiff testified, and it should be observed at this point that his demeanor as a witness was entirely unsatisfactory, by which is meant that the tenor of his whole testimony was consistent with a purpose to traduce the captain and the chief engineer in broad and general terms, but it was extremely difficult to pin him down to anything. He was obviously a man with a grievance which he proposed to air—not factually but in order to indulge in unrestrained denunciation.

Before any testimony whatever was taken, his counsel made the request of the court out of the hearing of the jury, that the plaintiff be permitted to testify in the absence of the master and the chief engineer, whom he wished to have excluded from the courtroom. Of course the request was refused, but it was an indication of a purpose to encourage the plaintiff to give rein to his imagination in the hope of impressing the jury, and that is exactly what he attempted, and with obvious impatience whenever he was urged to state facts within his knowledge.

To resume his narrative: He said that, after he left the captain's cabin, he requested an aspirin tablet, which the chief engineer gave him in the latter's cabin, and then the plaintiff turned in; his bunk was in the housing under the poop-deck on which, according to the testimony, a four-inch gun was mounted. The plaintiff said that after he turned in "the three of them came back there and they were hollering, and they had the guns there and they had them strapped around them, and they went back aft where we generally make our wash, where we wash our dungarees and socks and everything, and the captain and them, they picked these things up, threw them up in the air, using them for targets, shooting at them.

"We were still in convoy, and then they would find these bottles and fire at these bottles that they had, these whiskey bottles, and they would throw them up in the air and take as they call pop shots. They scared the whole crew. They were not satisfied with that. They went up to shoot all the big guns, and on the rear of the convoy there was a mercy ship, on the rear of us, after us, and they had to get out of our way from the way they were shooting these big guns right into the convoy, and they were scaring everybody all over the deck. * * *"

The foregoing is of course unbelievable.

In the first place, if by a mercy ship the witness meant a hospital ship, as it is presumed he did, of course there was none in a merchant convoy, which is regarded as a legitimate target for submarines. Moreover, to say that a four-inch gun would be shot in the direction of such a vessel or into a convoy is to state that which really requires no denial, although of course it was categorically and convincingly denied by the officers. It was such an obvious and arrant piece of perjury, that it is difficult to understand why a jury should be asked to

speculate upon the value of the plaintiff's testimony as a whole.

The plaintiff's further complaint was that he had trouble with his teeth, and sinus trouble, and was unable to get medical treatment to relieve either condition. He said that he induced the chief engineer to ask the ship's master to procure medical attention for him, but without success; that is to say, the master refused to give him anything to relieve his pain, and abused him and told him to leave his quarters.

Further, that he asked to go ashore, and the captain "said: 'There is no shore leave.' Well, we did not have no shore leave. *I never had any shore leave from the time I went on the vessel."* He contradicted this on cross-examination by stating that he not only had shore leave in Halifax after leaving New York, but that he received medical treatment in Halifax, where he went to a doctor because of an injury to his thumb, and he continues: "and I went to the doctor and I had the teeth treated at the same time I was there." Namely, he had two days shore leave.

With regard to medical treatment, when the Gateway City was in Iceland, where she apparently spent a number of days, he went to a United States Navy hospital ship, the Melville, on each of a number of days, and this continued until orders were issued by the Naval authorities that merchant seamen were no longer to be treated on that ship. That of course was not a matter that the master of the Gateway City could control.

As to the sinus trouble, there is evidence that at least under date of May 25, 1942, while the ship was at Gourock, Scotland, a doctor was called to the ship to treat the plaintiff, and he gave a certificate as to his condition, which reads as follows:

"Gourock, Scotland.
"May 25, 1942.
"To: H. E. Heller
"Master S. S. Gateway City.
"This is to certify that I have examined William Ennis, Watertender of the above vessel on this date at 11.00 PM and I find his temprature (sic) is normal, no evidence of inflammation in his nose or other signs of Frontal Sinusitis and I consider him fit for immediate duty.
"James Travis M. D.
"(Sgd) James Travis, M.B.C.B."

The foregoing is consistent with an observation on the part of that doctor that the plaintiff was a plain malingerer.

The recital of what took place when the ship was in Iceland is incoherent so far as the plaintiff is concerned, but it sufficiently demonstrates that he received all the medical care and attention that it was possible for him to have, and it is not gathered from his testimony that he has any real complaint on that score, but that he seeks to justify his desertion of the ship solely because he said he was in fear for his life, by reason of the incidents that have been recited.

It is not too much to infer that there was a United States Consul at Reykjavik. He mentions being there when his ship was detached from the convoy, and it later appeared that he had been ashore for some twenty-eight hours while in Iceland, and it is to be supposed that he could have communicated with the United States Consul, had he chosen to. However, this motion is not disposed of on that theory.

■ As has been stated, when the ship anchored in the Clyde, he received his four days leave, and deserted. As to that, there is no dispute by him. That is to say, when he left the ship, he did not intend to return. The only question in the case is whether he was justified in leaving the ship, because of cruel and inhuman treatment and because there was reason for him to believe that his life was in danger.

Had he entertained such a belief honestly, he would have immediately gone to the United States Consul in Glasgow and made his complaint, and had the matter investigated; he knew enough to go there as has been stated, but he was careful not to do it until he could be sure that the ship, and therefore her officers, were no longer available for investigation at the instance of the Consul. The plaintiff's entire story is unconvincing to the extent that it must be rejected. It is incredible:

(1) That at the interview of May 17, 1942, the captain or either of the others present threatened the plaintiff's life with a pistol, or otherwise; I do believe that they told him that, if he did not cease trying to make trouble in the gun crew, he would be dealt with as the circumstances might require.

(2) That the two officers and the captain of the gun crew were drunk, for the reason that the convoy was in constant danger and both the master and the chief engineer knew that at any moment their ship might be called upon to maneuver in obedience to convoy signals, and that their very lives

would depend on their ability to perform their duties in such an emergency. There was nothing in the appearance, demeanor or manner of testifying on the part of the master and the chief engineer to admit of any doubt on that score. They are native-born citizens who have earned their present positions by years of experience and training, and gave every indication of being capable officers who are meeting in all respects the high responsibilities which attach to service in our Merchant Marine.

(3) That the four-inch gun or any other elements of the ship's armament were wantonly discharged on the morning in question, or at any other time. As the plaintiff was forced to admit on cross-examination that he could not see the gun from the place where his bunk was, his entire testimony on that subject was discredited, had it not been otherwise unbelievable.

(4) That there was any lack of adequate medical attention to the plaintiff while he was on the Gateway City. His own testimony is to the contrary effect, and the certificate which has been quoted of the doctor who examined him on May 25th corroborates that statement.

(5) From my observation of the plaintiff on the witness stand, I am satisfied that no reliance can be placed upon his testimony, either because of some defect in his mental processes (as for instance the gratuitous but untrue statement that the master and the chief engineer were brothers-in-law) or because, while he knew himself to be in the wrong, he undertook through a lurid but fictitious recital to persuade the jury to order a payment of some money to him in excess of what he received when he left the ship as she lay in the Clyde.

(6) I am satisfied that the plaintiff is plain deserter and left his ship, not because he had suffered cruel treatment at the hands of the officers, or because his life, his health or his bodily safety was in peril at their hands, but because he found the experience of sailing on a merchant vessel in wartime, and in a convoy, more burdensome and rigorous than he had bargained for; and because he was willing to forfeit the contract which he entered into by signing the ship's articles, rather than continue in service.

Had the jury returned the verdict for the plaintiff, it would have been the duty of the court to set it aside after a study of the record, and certainly that duty is none-the-less present because the jury did not come to an agreement.

Accordingly a verdict is directed for the defendant, but judgment cannot be directed in its favor for the amount of counterclaim pleaded in the answer, because there was no evidence offered to demonstrate how much was paid for the *plaintiff's return passage to this country*.

Settle order.